### ORTLIEB v. BAUMER et al.

District Court, S. D. New York.
Feb. 9, 1934.

Paul Jones, of New York City (Morris H. Marder, of New York City, of counsel), for plaintiff.

Solomon Badesch, of New York City, for defendant Peter Baumer.

Irving Jacobson, of New York City, for defendant Marie Frances Baumer.

CAFFEY, District Judge.

This has been a very puzzling case. It has been filled with irrelevancies. The ill feeling between the litigants is utterly immaterial to the determination of the issues. The situation in which the bankrupt found himself—in the respects that he suffered ill health, he had domestic infelicities, and he has been greatly harassed by creditors—is likewise immaterial. Whatever might be the feeling of the court in regard to his misfortunes, which I have mentioned, they are not pertinent to the determination of the issues now before the court. If they be of any significance whatsoever, they are only to be taken into account as an aid in interpreting his conduct.

As I have indicated several times during the trial, there are some unsolved mysteries left by the proof and left by counsel on both sides.

What was the state of the contract arrangements or deeds, or what not, as between the defendants or either of them and the Amsterdam Company, down to March 6, 1930, has not been clearly revealed.

So also the first deed from the Amsterdam Company is dated March 6, 1930; yet, the purchase contract, as between Mr. Baumer and the Amsterdam Company, is dated the day after. Some deeds have been put in evidence. One as produced is from the Amsterdam Company to Mr. West, dated March 6, 1930. Another as produced is from Mr. West to Mrs. Baumer dated July 12, 1932. Yet, under the proof, when executed, both deeds were left with the respective names of the grantee blank.

The inference is pretty plain that the name of West, as grantee under the March, 1930, deed, was filled in at the time when the deed was pledged by Mr. Baumer to the National Surety Company. That was in April, 1931, when the deed, with the name of the grantee blank, had been outstanding for more than thirteen months.

When, or by whom, the name of Mrs. Baumer, as the grantee, was inserted in the deed from Mr. West dated July 12, 1932, is left wholly unexplained. The affirmative evidence is that when the deed came back to Mr. Baumer from the National Surety Company in July, 1932, it was blank as to grantee. For a considerable time it remained blank. Examination of the original document, Exhibit D, shows that the name of the grantee is in a different typewriting from the typewriting in which the body of the deed is written. The acknowledgment of the deed is as of the date of the deed itself.

So I say that we have all these mysteries unexplained. I have presented them to counsel throughout, but they have rendered me no assistance whatever in solving them. They have added to my bewilderment in trying to get at the essential facts of the case.

Two issues are made by the pleadings:

First, Was there a transfer by the bankrupt to his wife which is voidable under the bankruptcy statute because preferential?

Second, Was there a transfer by the bankrupt to his wife which should be set aside because by it the bankrupt's creditors were hindered, delayed, or defrauded?

Before entering on the consideration of those questions, it is well to recall that this case deals with land, and land only. It is the law that in order to transfer title to land there must be a deed. Moreover, the deed must be delivered. Title does not pass by the mere execution of a deed; in addition, there must be delivery of the deed if title is to pass. When in the light of that circumstance we examine the proof and attempt to solve the problems raised by the two issues, much of what has

been said is so indefinite about so many things, there have been such complete omissions in the evidence about so many matters, there has been failure of recollection about so many matters, there have been so many silences through failure to call witnesses, there are so many things which are uncorroborated by documents, that it is extremely difficult to get at the truth.

■ I may further point out that in passing on the questions I am not free to go outside the issues as made by the pleadings. While minor matters may be disregarded, I must look to the pleadings in order to render a decree on the issues as raised.

Let us first take up the first cause of action. Was there a preferential transfer by the bankrupt to his wife?

■ Section 60 of the Bankruptcy Act (11 USCA § 96) dealing with voidable transfers because preferential, has in mind transfers made to creditors of the bankrupt. The testimony, however, fails satisfactorily to establish that Mrs. Baumer was a creditor of her husband. That and that alone is an obstacle to setting aside the transfer, if it occurred, on the ground, as alleged, that it was preferential. Preferences are as between people in the same class, as creditors; and preferences relate only to creditors. In order for a transfer to be set aside under the provisions of section 60, as preferential, one of the elements is that the transferee shall have reasonable cause to believe that by the transfer a preference would be effected.

■ In weighing the evidence, if fair consideration is to be given to it, account must be taken of the relations between the bankrupt and the transferee, for the moment treating the bankrupt as the transferor. They were husband and wife. She lived in Pennsylvania and apparently spent most of her time there. It is not the ordinary experience that wives know the general financial conditions of their husbands, to the extent of embracing knowledge both of assets and liabilities. There must be some proof on the subject. Yet I fail to discover in the evidence enough to warrant me in making a finding that Mrs. Baumer knew or had reasonable cause to believe that, if she accepted a transfer of the lots at Sparkhill, she would thereby be treated better than other creditors of her husband of the same class. Lacking a finding to that effect, the transfer cannot be set aside upon the ground that it was preferential.

The third difficulty which I encounter under the first cause of action is that the complaint charges that the bankrupt transferred the property to his wife. The facts are as I have already set them out. There was an original purchase agreement as between the Amsterdam Company and the bankrupt, signed on March 7, 1930. What had happened before that, with reference to how the transaction should be conducted or how title should be vested, has not been brought out in the proof. On the day preceding the date of the purchase agreement, the Amsterdam Company signed a deed to a blank grantee. That deed seems to have gone into the possession of the bankrupt, although the proof is not clear as to the capacity in which he handled it, nor are his declarations and his conduct thereafter, as to the capacity in which he held it, consistent. They point either way. From the inception, the evidence as to the handling of the deed of March 6, 1930, is utterly confusing. The evidence in regard to it is extremely difficult of interpretation as affecting whether or not it was the genuine understanding between the parties that, as would not be unnatural, the husband held the instrument as agent for his wife, or whether it be a fact that the bankrupt handled, and intended to handle, the instrument as his own, because he made unambiguous declarations of ownership of the land. To the contrary of his individual ownership, the proof being inconsistent, the declarations and the acts of the bankrupt having been inconsistent, there has been evidence from which a conclusion might be drawn that the bankrupt at all times recognized that he held that instrument solely for the benefit of his wife. I cannot disbelieve the testimony to the effect that frequently the bankrupt, before making use of the instrument, did consult his wife. That would point, directly and only, to a recognition by him that he held the deed to a blank grantee as the agent and for the benefit of his wife. If that be so, not alone is there absence of the existence of the kind of instrument looked to by the law as the exclusive evidence of having title to real estate, in which the bankrupt was treated as the owner of the property; but, as I have said, if the facts be as I have recited them, there was recognition by the husband that he held the instrument for the benefit of his wife and not as his own property.

I am endeavoring to search out the truth. Merely to point out to me that people have been inconsistent or have been careless is not enough. It is perfectly manifest that the husband, in regard to the matter, has been careless and has done inconsistent things. I think I may say that, as matter of general knowledge, in the conduct of family life

there is nothing unusual about this. Husbands frequently are so trusted by their wives that they do inconsistent things, without preservation of evidence as to what the real transaction is.

There is a fourth aspect of the first cause of action, though upon this I should be unwilling to decide the case if it were all.

One of the elements of a right of recovery in a preference action under section 60 is that the person who receives it shall know or have reasonable cause to believe that the transfer will effect a preference. There is no allegation in the complaint that the transferee, Mrs. Baumer, knew or had reasonable cause to believe that the transfer would effect a preference. On the contrary, the only allegation on the subject of knowledge or belief is in paragraph 18 of the complaint, as a part of the statement of the first cause of action. This is to the effect that the bankrupt knew, or had reasonable cause to believe, that a preference would be effected.

For the reasons given, I do not feel that the first cause of action is established or that there can be a recovery thereon.

█ Was there a so-called fraudulent conveyance?

As I have indicated, under the law a transfer which hinders or delays creditors is denounced in law equally with a transfer which defrauds creditors. When we analyze the proof, when we examine the testimony of the bankrupt himself, as given at this trial, and when we compare that, part by part, with the testimony as given by the wife at this trial, there are many inconsistencies and conflicts. I cannot fail to take into account, as to the bankrupt himself, that he has been ill, that he has been harassed, and that he has been unhappy. As a trier of the facts, if I am fairly to appraise the evidence, I must take those features into account. I cannot fail to observe also that the wife is unaccustomed to the surroundings of a courtroom. Her testimony yesterday and to-day contained numerous inconsistencies. Furthermore, her testimony in many respects was inconsistent with the testimony of her husband.

If the original contribution by the wife toward the purchase of the Sparkhill property was such, irrespective of the amount, that it was the understanding between and the intention of the husband and the wife, prior to March 6, 1930, that the purchase of the lots was for her benefit, and if it be true, as certainly the evidence affords basis for reasonably concluding, that the taking of the deed from the Amsterdam Company, executed March 6, 1930, in form with a blank grantee, was merely for convenience, we are not concerned in this case actually with who had possession of the deed from West to a blank grantee, or with the date when the blank was filled in with the name of Mrs. Baumer, or with the date when it was put on record, or even with who held the instrument between July 12, 1932, and the date of its being put on record, December 27, 1932. This is so because if the original understanding was as claimed by the husband and the wife, that, in the light of a contribution by the wife to the purchase price, the lots were to be hers, the transaction was secure, so far as there is any basis for assault upon it in this case, as far back as March, 1930. There is no proof whatsoever which would warrant a successful assault on the deed as far back as that, whatever may have happened as to the form of the instrument or as to who held it or as to how it was handled after West passed it back to the bankrupt.

I shall not spend much time in discussing the testimony bearing on the issue as to whether there was a fraudulent conveyance. There is one aspect of it, however, which is of consequence and which I shall discuss.

It is established that there were liabilities by the bankrupt aggregating approximately $13,000, covering transactions that had accumulated, running from 1928 to 1932. The schedules are not proof as against the wife of what the indebtedness was. They are nothing but pieces of paper, so far as she is concerned. There must be original proof of the indebtedness as against her, in order successfully to assail a transaction whereby she received the transfer of property. When the bankrupt was on the stand as a witness for the plaintiff, and was asked about indebtedness to various creditors, he testified in regard to a considerable group of his creditors, some fifteen or twenty, that he owed them amounts which, between various dates from 1928 to 1932, aggregated approximately $13,000. This morning he testified to owing two other items of indebtedness. One of them was to the Joseph brokerage concern, which had been covered by testimony of the Joseph bookkeeper given yesterday, showing an indebtedness of some $2,000, but not showing that there were not securities held against the sum largely in excess of $2,000. That is, it does not appear that there was any net indebtedness to Joseph at any particular time in advance of the bankruptcy, because the proof showed that the brokerage account ran to June, 1933, four months after the bankruptcy petition was filed. Assume,

however, that the indebtedness to the brokerage concern was $2,000 and ran back to the opening of the account in 1928, varying from time to time. By adding that to the $13,000, the total indebtedness would be carried to $15,000. It was brought out this morning that the bankrupt owed $900 to Herman Grimm, a brother of his wife; call it $1,000 in round figures. If this be included, then the upward limit of the bankrupt's indebtedness, of which there has been any proof at this trial, is $16,000.

What about the assets?

The trustee was on the stand several times. Yet he gave no testimony whatsoever, nor was there proof from any other source, as to the total assets that he took into his possession. There was affirmative testimony that he went to the bankrupt's office and took over some papers. There was no testimony by him as to whether there were other assets that came into his hands.

Let us assume, however, that nothing of value came into the hands of the trustee. The testimony put in by the plaintiff himself discloses that the Joseph brokerage concern held, during the whole of the period with which we are concerned, down to the bankruptcy, a lot of securities. Those securities were the property of the bankrupt. It may be that there were varying amounts of indebtedness owing by the bankrupt to the brokerage concern during the period covered by the account, as there often are; but, nevertheless, there is no proof whatsoever that there was, not in the brokerage account an equity in the securities that was in excess of the $16,000 of indebtedness he owed to all his creditors. The bankrupt himself tells us that there were occasions during the maintenance of the brokerage account when the excess was great; as I recall, as much as $100,000. This is the only proof the record affords as to the value of the equity in the securities.

The burden of proof is on the plaintiff. His first step in assailing the transfer should have been to show what were the assets that came into his hands. Then he was obligated to show what was their value and what was the value of any other assets of the bankrupt at the relevant date. It was up to him also to show what the liabilities were. From the showing of those two sets of facts, the court would have been enabled to tell whether or not at the relevant date the bankrupt was insolvent. The trustee has given us no picture of the assets or of their value. In consequence, he has not proved that the bankrupt was insolvent. Without proof of insolvency, there is no ground upon which the trustee is entitled to have the transfer of the lots declared fraudulent or to have it set aside.

There is no occasion to go into all the conflicts about the deed or about the time when the name of the grantee was filled in or about who handled it in sending it to be recorded. Much of the testimony in regard to those matters is very unsatisfactory. If the case turned on things like that, I should go pretty carefully into the consideration and discussion of them before I should be willing to say that the version given me by either the wife or the husband is acceptable. It would be futile, however, to go into those things. The vice in the plaintiff's case is fundamental. It is utterly regardless of how I should determine what I have called puzzling or what I have recited as conflicting or unsatisfactory.

The very basis of the cause of action to set aside the transfer of the lots as fraudulent is that at the time, whenever it was, the bankrupt was insolvent and, as already stated, the plaintiff has failed to show that he was then insolvent.

If the bankrupt was solvent, he had a right to give the property to his wife. Even if he had had title to it in his own name, even if he had treated possession by him of Exhibit D with a blank grantee as holding the deed for himself to the property, if he was not insolvent, he had the right to give the lots to his wife. I go to that fundamental consideration, rather than to the other things argued, which are merely out on the edge of the controversy.

That the bankrupt was hostile to some of his creditors is manifest. It is not within my province to tell him that he was not warranted in feeling hostile. People have a right to sue. The courts are open to them to sue. When, however, the suit comes on for trial, it is necessary to determine the issues as made by the pleadings. It is the function and the business of the court to afford everybody a fair opportunity to present his side and to put in evidence. Then it becomes the duty of the court to review the evidence under the law and render its best judgment. That I have done.

The bill will be dismissed.