In re JEFFREY BIGELOW DESIGN
GROUP, INCORPORATED,
Debtor.

John H. HARMAN, Trustee,
Plaintiff–Appellant,

v.

FIRST AMERICAN BANK OF MARY-
LAND; Ann Donatelli; Louis D. Dona-
telli; Donatelli & Klein, Incorporated;
Jeffrey Bigelow, Defendants–Appellees.

No. 91–1508.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1991.

Decided Feb. 13, 1992.

John H. Harman, Coggins & Harman, P.A., Silver Spring, Md., argued for plaintiff-appellant.

Brian F. Kenney, Miles & Stockbridge, Fairfax, Va., Mark Lyman Corrallo, Conroy, Ballman & Demeron, Chartered, Gaithersburg, Md., argued (Donald H. Hadley, Hadley & House, and Stanton J. Levinson, Bethesda, Md., on brief), for defendants-appellees.

Before RUSSELL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

CHAPMAN, Senior Circuit Judge:

Plaintiff/appellant John Harman, the bankruptcy trustee, filed a complaint in the bankruptcy case of Jeffrey Bigelow Design Group, Inc., the debtor, in the Bankruptcy Court for the District of Maryland, seeking to recover alleged fraudulent transfers or voidable preferences paid by the debtor to First American Bank of Maryland ("First American"). At the close of evidence, the trustee moved to amend his complaint a third time, but this was denied. The bankruptcy court held that the payments were not fraudulent transfers but were voidable preferences. On appeal, the District Court for the District of Maryland affirmed in part and reversed in part, holding that the payments were neither fraudulent transfers nor voidable preferences and that the bankruptcy court did not abuse its discretion in refusing to amend the complaint. 127 B.R. 580. We affirm the decision of the district court.

### I.

In September 1985, Donatelli & Klein, Inc., ("Donatelli & Klein") acquired 50% of the stock of the debtor in exchange for a cash payment and the arrangement with First American of a line of credit for the

benefit of the debtor. This line of credit was personally guaranteed by Ann and Louis Donatelli. The line of credit was originally for $250,000, but was rolled over numerous times and eventually reached $1,000,000. Although Donatelli & Klein was the maker of the line of credit, only the debtor received the draws and all payments were made directly from the debtor to First American. Subsequently, in February 1986, the debtor executed a note for $1,000,000 to Donatelli & Klein with substantially the same terms as the line of credit between First American and Donatelli & Klein. As the debtor directly repaid First American, its liability on the note to Donatelli & Klein likewise decreased. In June 1987, Donatelli & Klein executed another note to First American personally guaranteed by Ann and Louis Donatelli for the benefit of the debtor. Throughout 1986 and 1987, the debtor drew upon the lines of credit and sent the payments directly to First American.

Technically, a tripartite relationship exists, where Donatelli & Klein is a creditor of the debtor and First American is a creditor of Donatelli & Klein. The debtor, in making its payments, in effect skips its true creditor and sends the money to First American, to whom it has no direct obligation.

The debtor filed its petition in bankruptcy under Chapter 7 on December 22, 1987. In August 1988, the trustee filed a complaint seeking to recover payments from the debtor to First American as voidable preferences. First American then joined Donatelli & Klein, Ann Donatelli, and Louis Donatelli as parties and seeks indemnification. The trustee amended the complaint twice, first to add defendants and to state a claim for recovery of the payments as fraudulent transfers, and second to correct certain allegations and to add other payments by the debtor to First American. The bankruptcy court heard the arguments on January 31 and March 12, 1990. At the close of evidence, the trustee sought again to amend his complaint to provide for preferences to insiders between ninety days and one year of bankruptcy. The court denied the request and held that the payments were not fraudulent transfers, but were voidable preferences. On appeal, the district court upheld the denial of the request to amend and the finding that the payments were not fraudulent transfers, but reversed the finding that the payments were voidable preferences.

## II.

This case presents four distinct issues: (1) whether the bankruptcy court abused its discretion in denying the request to amend the complaint; (2) whether the payments from the debtor to First American were actual fraudulent transfers under section 548(a)(1) of the Bankruptcy Code; (3) whether the payments from the debtor to First American were constructive fraudulent transfers under section 548(a)(2) of the Bankruptcy Code; and (4) whether the payments from the debtor to First American were voidable preferences.

The standards of review for these issues are as follows. "Disposition of a motion to amend is within the sound discretion of the [trial] court" and requires a finding of an abuse of discretion for reversal. *Deasy v. Hill,* 833 F.2d 38, 40 (4th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988). For a finding of fraudulent intent in an actual fraudulent transfer, a reviewing court must apply a clearly erroneous standard. *First Eastern Bank v. Jacobs (In re Jacobs),* 60 B.R. 811 (M.D.Pa.1985), *aff'd without opinion,* 802 F.2d 446 (3d Cir. 1986). In reviewing a decision concerning reasonably equivalent value for fraudulent transfers, the courts are split as to whether the appellate court should apply a clearly erroneous or *de novo* standard. *See Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 467 (4th Cir.1990) (acknowledging disagreement among the courts). We decline to adopt one of the standards, because we find under either standard that the district court did not err. While courts disagree on the standard of review for decisions involving the ordinary course of business exception to voidable preferences, the

Fourth Circuit has adopted the clearly erroneous standard. *See Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 801 (4th Cir.1991). *Compare Fidelity Sav. & Invest. Co. v. New Hope Baptist*, 880 F.2d 1172, 1174 (10th Cir.1989) (*de novo* standard applied), *with Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 806 (5th Cir.1989) (clearly erroneous standard applied).

### A.

### Motion to Amend the Complaint

■ The trustee argues that the court abused its discretion by not granting the motion to amend. Bankruptcy Rule 7015 governs amendments to pleadings and states that "Rule 15 F.R.Civ.P. applies in adversary cases."[1] Rule 15 provides:

(a) **Amendments.** A party may amend the party's pleading once as a matter of course.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

(b) **Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

A motion to amend should be denied only "where the motion has been unduly delayed and where allowing the amendment would unduly prejudice the non-movant." *Deasy*, 833 F.2d at 40.

■ The trustee blames First American for the first amendment. The trustee argues that First American's discovery responses, which were "many months late" and returned just prior to trial, introduced new defendants that had to be added. We note, however, that the trustee also included the fraudulent transfer count in the first amendment. The second amendment added the words "owed by the Debtor" to the voidable preference count and included more payments which the trustee claims had only recently come to light.

At the close of evidence, the trustee moved to amend his complaint a third time to extend the preference period from ninety days prior to bankruptcy to one year because of the existence of insiders. The trustee argues that the motion was not unduly delayed and that granting the motion would not unduly prejudice other parties. The trustee points out that the trial had already focussed on the one year period prior to bankruptcy through arguments respecting the fraudulent transfer section which examines the same one-year period. Furthermore, evidence at the trial indicated that some of the defendants were insiders. Hence, the trustee argues that no further evidence would be needed to establish the existence of voidable preferences during the year before bankruptcy. We find no abuse of discretion.

Although the trustee discusses numerous cases involving Rule 15, most of the cases are distinguishable. In most of the cited cases, the trial court had granted the motion to amend, an action which "shall be freely given." Fed.R.Civ.P. 15. Only two of the cited cases raise the issue whether the trial court abused its discretion in denying the motion to amend. Under their facts, the courts found that the amendments simply altered the theory of the case

---

**1.** A proceeding to recover money is an adversary proceeding. Fed.R.Bankr.P. 7001(1).

and did not add a new cause of action and that the amendments did not prejudice other parties. *See Crossland v. Canteen Corp.,* 711 F.2d 714 (5th Cir.1983) (added state law prerequisites for recovery of attorney's fees); *Robbins v. Jordan,* 181 F.2d 793 (D.C.Cir.1950) (evidence that the defendant held himself out as a specialist; continuance would have prevented any undue prejudice).

*Crossland* and *Robbins,* however, are easily distinguished. The timing of the motions in those cases differs from the timing of the motion here. The motion to amend was made at the middle of the trial in *Crossland* and at the beginning of the trial in *Robbins. See Crossland,* 711 F.2d at 729; *Robbins,* 181 F.2d at 794–95. The motion here was made later, at the close of the evidence.

Furthermore, this case presents other peculiar facts which indicate that no abuse of discretion occurred. Namely, a six week intermission in the hearing provided the trustee ample opportunity to move for an amendment. The "insider preference" theory was not novel, and the trustee should have known of its existence at the intermission, if not before the trial. The substance of the proposed amendment also tends to indicate that prejudice to the non-movant parties may result. Specifically, extensive briefing of the insider preference theory would be necessary because the theory has received mixed critiques and has not been directly addressed by this circuit.[2] In addition, because this motion for leave to amend was the trustee's third, the bankruptcy court could easily find that the motion was unduly delayed and that allowing the amendment at this stage would have unduly prejudiced the other parties. Considering the entire situation, we can find no abuse of discretion.[3] The bankruptcy court

is in a better position than we are to determine whether the motion for leave to amend was unduly delayed and whether granting the motion would result in undue prejudice.

### B.

### Actual Fraudulent Transfer

■ Section 548(a), which concerns fraudulent transfers, provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent . . .;

(ii) . . . [had] unreasonably small capital; or

(iii) . . . would be beyond the debtor's ability to pay. . . .

The trustee argues that the bankruptcy court erred in finding that under subsection 548(a)(1) no "actual intent to hinder, delay or defraud" existed. We find no merit to the trustee's argument.

■ While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that

---

**2.** The "insider preference" theory was formulated by the Seventh Circuit in the so-called *Deprizio* case (*Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186 (7th Cir.1989)) and has become very controversial. *See generally The Official Creditors' Committee of Arundel Housing Components, Inc. v. Georgia Pacific Corp.* (*In re Arundel Housing Components, Inc.*), 126 B.R. 216 (Bankr.D.Md.1991) (rejecting theory). We decline to comment on the viability of the theory.

**3.** The trustee also argues that, because the introduction to the second amended complaint states that the adversary proceeding involves section 547(b) which includes both the ninety day and one year preference periods, the entire complaint, through the introduction, did in fact include the one year preference period. We find no merit to this argument. More specificity is required.

actual fraud existed. 4 *Collier on Bankruptcy*, ¶ 548.02[5] (15th ed. 1989). Courts, however, are aware that there is a difference between actual and constructive fraudulent intent. Regardless of the ability of courts to infer actual fraudulent intent from the presence of "badges of fraud," *see Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987), actual fraudulent intent requires a subjective evaluation of the debtor's motive. Certainly, an objective determination has bearing on whether constructive fraudulent intent exists, but is not conclusive for actual fraudulent intent. *See id.* at 1509.

As proof of fraud, the trustee notes that the books of the debtor did not list any obligation directly to Donatelli & Klein. Instead, the obligation named First American. The trustee argues that this concealment is an indicium of fraud and drew an analogy to a case which found that fraud existed where individuals were misappropriating property of the corporation for their personal use. *See In re Rockaway Soda Water Mfg. Co.*, 226 F. 520 (E.D.N.Y. 1915). While transactions involving insiders should be closely scrutinized, *see EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.)*, 934 F.2d 1315, 1323 & n. 3 (4th Cir.1991), the facts here do not suggest that the insider gained personally from the transaction. In fact, only the debtor received draws on the lines of credit.

The trustee also states that the debtor paid First American regularly while falling deeper into debt with other creditors. The trustee cites a number of pages in the joint appendix as support, but none truly support his position. They all demonstrate that the debtor drew upon the lines of credit and repaid First American, but do not indicate whether, as a result, the debtor fell deeper into debt with other creditors. In fact, the evidence demonstrates that, in terms of payments, the debtor treated First American like any other creditor. The financial manager for the debtor stated that he had not intended payments to First American to be different from payments to other creditors. (J.A., 1035a).

Far from supporting the trustee, the evidence indicates that the debtor had not acted negligently or recklessly, much less actually intended, to hinder, delay, or defraud other creditors. The books did not list Donatelli & Klein as creditors, because, as agreed, the debtor, not Donatelli & Klein, was responsible for the payments to First American. The books reflected the economic reality of the situation.

## C.

### Constructive Fraudulent Transfer

For the constructive fraudulent transfer count to succeed, the trustee must show that the debtor received less than reasonably equivalent value in exchange for its payments and that the debtor was insolvent at the time. 11 U.S.C. § 548(a)(2) (1988). Because it is uncontested that the debtor was insolvent during the period one year prior to the bankruptcy, the issue is whether reasonably equivalent value was given in exchange for the payments. In explaining the phrase "reasonably equivalent value," one commentator has stated:

> Reasonably equivalent value is not susceptible to simple formulation.... The focus is on the consideration received by the debtor, not on the value given by the transferee. *The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. Consequently, what constitutes reasonably equivalent value must be determined from the standpoint of the debtor's creditors....*

Jack F. Williams, "Revisiting the Proper Limits of Fraudulent Transfer Law," 8 *Bankr.Dev.J.* 55, 80 (1991) (footnotes omitted) (emphasis added). Hence, the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

The trustee argues that, since no true contractual relationship existed between the debtor and First American whereby the

debtor had any obligation to First American, the debtor received nothing in exchange for its payments. The trustee cites a number of cases, most of which he misconstrues. For example, the trustee cites *Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.)*, 51 B.R. 739 (Bankr.S.D.Fla.1985), for the proposition: "'There is no doubt that usually a diversion of corporate assets for the benefit of a third person, such as the payment of a loan of another, is a transfer without fair consideration.'" *Id.* at 739 (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829 (5th Cir.1959)). However, the *Chase & Sanborn* court next stated that where the transfer is "from a corporate debtor in bankruptcy to a defendant bank in payment of the personal note of the debtor's dominant stockholder, where the benefit of payment inured immediately to the corporate debtor," the transfer is not fraudulent. *Id.* at 740. In essence, the debtor received the same amount which it paid to the bank. The court added other facts that make the case ultimately distinguishable, but the court persuasively stated, albeit as dicta, that on the facts indistinguishable from the ones here, no fraudulent transfer existed.

 It is well settled that reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule. The leading case on the rule, *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir.1981), states:

> [A] debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person.... [A]lthough "transfers solely for the benefit of third parties do not furnish fair consideration" ..., the transaction's benefit to the debtor "need not be direct; it may come indirectly through benefit to a third person." If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied—provided of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up. For example, fair consideration has been found for an individual debtor's repayment of loans made to a corporation, where the corporation had served merely as a conduit for transferring the loan proceeds to him.... [T]he decisions [cited] turned on the statutory purpose of conserving the debtor's estate for the benefit of creditors.

*Id.* at 991–92 (citations omitted) (under § 67 of the Bankruptcy Act); *see In re Holly Hill Medical Center, Inc.*, 44 B.R. 253 (Bankr.M.D.Fla.1984) (*Rubin* still applicable under § 548 of the Bankruptcy Code). In essence, and as previously stated, the focus is whether the net effect of the transaction has depleted the bankruptcy estate.

It seems apparent that the transfers have not resulted in the depletion of the bankruptcy estate. The transfers by the debtor served simply as repayment for money received. Other creditors should not be able to complain when the bankruptcy estate has received all of the money which it is obligated to repay. Otherwise, the creditors would receive not only the benefit of the money received from the draws on the lines of credit, but also the windfall of avoided transfers designed to repay the draws. In essence, the estate, and hence the unsecured creditors, would be paid twice. Consequently, we hold that no fraudulent transfer occurred.

### D.

### Voidable Preferences

 It is not disputed that the transfers were preferential.[4] The issue is

---

**4.** Section 547 of the Bankruptcy Code governs preferential transfers and provides in pertinent part:

(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;

whether an exception applies. First American claims that the transfers were in the ordinary course of business between the parties and, under section 547(c), it is entitled to an exception. Section 547(c) provides in pertinent part:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

Unfortunately, the Code does not provide any guidance for determining whether these factors exist. Nevertheless, the *Collier* treatise is helpful in stating:

To fall under the "ordinary course" exception, a transferee must show that: (i) the underlying debt on which payment was made was "incurred in the ordinary course of business or financial affairs" of both parties; (ii) the transfer was made "in the ordinary course of business or financial affairs" of both parties; and (iii) the transfer was made "according to ordinary business terms." The Code fails, however, to define these phrases. Those courts testing a transfer for "ordinariness" under section 547(c)(2) have generally focused on the prior conduct of the parties, the common industry practice, and, particularly, whether payment resulted from any unusual action by either the debtor or creditor.

. . . .

[For example,] [l]ate payments may be held to be made in the ordinary course of

(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—

business, when such payment practices were well-established between the parties.

4 *Collier on Bankruptcy* ¶ 547.10, at 547–50 to –51 (15th ed. 1990) (footnotes omitted).

Case law has provided further guidance. Describing the process for determining whether these ordinary course of business requirements are met, the Sixth Circuit stated that the "focus of [the] inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration." *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989). This inquiry is "peculiarly factual." *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988).

The trustee argues that the bankruptcy court correctly held that the payments were voidable preferences because the payments were not made due to short-term debt, but rather they were "purely and simply the payment of interest on a capital infusion to this debtor made in the form of the loan." (J.A., 1096a). However, a recent Supreme Court decision, filed subsequent to the bankruptcy court's decision, held that payments on long-term debt as well as short-term debt may qualify for the ordinary course of business exception. *Union Bank v. Wolas (In re ZZZZ Best Co.)*, — U.S. —, —, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991). The Supreme Court followed the explicit language of the statute, rejecting any distinction between long-term and short-term debt, and remanded the case for a determination whether the payments were in the ordinary course of business. *Id.* Hence, we must decide whether these payments, regardless of whether on long-term or short-term

(A) the case were a case under Chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

debt, were in the ordinary course of business.

The trustee also argues that the payments do not meet the requirements of the ordinary course of business exception. The trustee contends that the payments were made for a debt which was not incurred in the ordinary course of business or financial affairs of the debtor and First American; rather, "if anything, it was incurred in the ordinary course of business of [First American] and Donatelli & Klein." (Appellant's brief, 27). The trustee also emphasizes that the payments were not made "according to ordinary business terms." The trustee argues that because the transaction was to a certain extent "concealed" and "circuitous," it could not be considered according to ordinary business terms. Ordinary practice would dictate payment according to the terms of the documents. Finally, the trustee argues that the entire loan transaction is not ordinary. The debtor could not directly obtain a loan and had to rely on the principals of the debtor to obtain the loan.

In response, First American inexplicably relies on *Smith–Douglass, Inc. v. Borden, Inc. (In re Smith–Douglass, Inc.)*, 842 F.2d 729 (4th Cir.1988), for the proposition that payments of interest are in the ordinary course of business. In *Smith–Douglass*, the debtor executed a promissory note with Borden, Inc., and was obligated to pay interest as long as there was debt outstanding. The debtor could repay the principal anytime before the expiration of the note. Almost two years later, the debtor filed for bankruptcy and sought to recover the payments solely of interest made within ninety days of bankruptcy as voidable preferences.

The only issue before our court was whether the interest obligations were incurred within 45 days of bankruptcy, a prior requirement for the ordinary course of business exception.[5] Specifically, *Smith–Douglass* held only that the debt for the interest was incurred when it be-

came due and not when the parties originally signed the note. The court decided that the debt was incurred within 45 days of bankruptcy and never discussed whether the payments were in the ordinary course of business of the parties. As such, the case appears inapplicable. Even if an analogy to the facts of *Smith–Douglass* is drawn, the case is distinguishable. Most significantly, the relationship of the parties to the loan in *Smith–Douglass* was bilateral, which is certainly more "ordinary" than the tripartite relationship found here.

Despite First American's misguided reliance on *Smith–Douglass*, we agree that the ordinary course of business exception applies. Congress has noted that the purposes behind the preference section are to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy.... [and to] facilitate the prime bankruptcy policy of equality of distribution among creditors." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138. Furthermore, the purpose of the ordinary course of business exception is "to leave undisturbed normal financial relations because it does not detract from the general policy of the section to discourage unusual action by either the Debtor or its creditors during the Debtor's slide into bankruptcy." *Id.* at 373–74; *see Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 801 (4th Cir.1991) ("The purpose of the ordinary course exception is to 'leave undisturbed normal financial relations' which do not entail any 'unusual action' taken by either the debtor or the creditor.").

Keeping in mind the purposes of the preference section and the ordinary course of business exception, we find that the facts clearly support the district court's conclusion that the transfers were in the ordinary course of business. First, "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C.

---

5. The 45–day requirement has since been repealed by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–

353, 98 Stat. 333 (codified as amended in various sections of 11 U.S.C. and 28 U.S.C.).

§ 547(c)(2)(A) (1988). The analysis here should be similar to the analysis determining whether reasonably equivalent value was present. Attention should be drawn to the reality of the situation and not the formal structure. As previously discussed, a tripartite relationship existed. The debtor incurred the debt by drawing on the lines of credit set up by First American and Donatelli & Klein. However, all parties knew that the debtor was responsible directly to First American. As such, the transfers were simply payments on a normal loan debt as financing for the corporation. Most significantly and following the purpose of the exception, these transfers must be seen as normal and usual by other creditors. An entity encountering difficult financial times often seeks loans from reputable institutions as part of its workout efforts. Other creditors must have recognized that a loan from an institution like First American would be a logical and ordinary action for these parties.

Second, "such transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B) (1988). As mentioned in the preceding paragraph, form must not be elevated over substance. In this case, the payments to First American served to reduce proportionately the debtor's liability on its note to Donatelli & Klein. The debtor had periodically made these payments in a regular fashion for two years. We fail to see how these transfers could be more ordinary. The existence of two years of regular payments on the debt indicate that the last transfers, made in the same manner, are simply following the ordinary course of business pattern between the two parties.

Third, "such transfer was made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C) (1988). Admittedly, the business terms setting up these transfers may not be commonplace; however, the Code requires only ordinariness. Congress was concerned that creditors would race to the courthouse to dismember the creditor or that a debtor would favor certain creditors over others, and by enacting the ordinary course exception, Congress wished to ex-cept normal transactions which do not promote these two concerns. These transfers from the debtor to the bank do not promote either of the congressional concerns and, given the fact that numerous court decisions have discussed similar tripartite relationships, *see, e.g., Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981); *In re Holly Hill Medical Center, Inc.,* 44 B.R. 253 (Bankr.M.D.Fla.1984), the transfers must be considered to have been made according to ordinary business terms.

### III.

For the foregoing reasons, we affirm the decision of the district court and hold: (1) the bankruptcy court did not abuse its discretion in refusing to allow the trustee to amend his complaint a third time; (2) no actual fraudulent transfer occurred; (3) no constructive fraudulent transfer occurred; and (4) the payments met the requirements of the ordinary course of business exception to voidable preferences.

AFFIRMED.

