**In re JOHNSTON INDUSTRIES, INC., Debtor.**

**Johnston Industries, Inc., Plaintiff,**

v.

**CB & T Bank of Russell County n/k/a CB & T Bank of East Alabama and Donald Massey, Defendants.**

**Bankruptcy Nos. 03–40293 to 03–40298. Adversary No. 04–4089.**

United States Bankruptcy Court, M.D. Georgia, Columbus Division.

June 6, 2006.

Stuart F. Clayton, Jr., Atlanta, GA, for Plaintiff.

David B. Anderson, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

This matter comes before the Court on Plaintiff's complaint to recover preferences and the parties' cross motions for summary judgment. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(F). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Undisputed Facts

Debtor–Plaintiff Johnston Industries filed a Chapter 11 petition on January 31, 2003. On September 24, 2004, Debtor filed this adversary proceeding to recover as preferences certain transfers it made to Defendant CB & T Bank in connection with an employee stock purchase plan. Debtor initially sued both CB & T and former employee Donald Massey. However, Debtor has settled its dispute with Massey and removed him as a defendant. Both parties have filed motions for summary judgment, and they have filed a joint stipulation of facts. The Court finds the following facts to be undisputed:

*Employee stock purchase plan:* On or about October 15, 1990, Debtor adopted an employee stock purchase plan (the "Plan") for the purpose of providing incentives to key employees and directors. Pursuant to the Plan, Debtor assisted employees in purchasing stock in Debtor by guaranteeing payment of bank loans arranged by Debtor. Debtor arranged the loans with Defendant CB & T Bank.

On June 11, 1996, Debtor executed a guarantee of up to $5,582,768.05 in loans made under the Plan that were maturing from 1998 through 2000, including loans made to (1) Donald Massey with a principal balance of $171,553.14; (2) Colman O'Connell with a principal balance of $147,239.64; (3) Larry Galbraith with a principal balance of $410,500.76; and (4) David Chandler with a principal balance of $1,703,062.83. On October 6, 1998, Debtor requested that CB & T extend the maturities of loans maturing on December 31, 1998, in connection with ongoing turnaround efforts. CB & T agreed to the extension and on January 31, 1999, Debtor executed an "Affirmation and Clarification of Guaranty." In December 1999, Debtor requested another extension, and Debtor and CB & T negotiated the terms of an extension and renewal. In February of 2000, CB & T issued a commitment to renew the loans for five years with payment required upon the occurrence of certain events, including termination of employment.

*Massey loan:* The loan to Massey was renewed by promissory noted dated April 3, 2000 in the principal amount of $171,653.14. The note was payable in full on March 30, 2005 with interest due quarterly.

In the first quarter of 2002, Debtor decided to attempt to find a buyer for one of its wholly-owned subsidiaries, Johnston Industries Composite Reinforcements, Inc. At the time, Massey was president of the subsidiary. In connection with the potential sale of the subsidiary, Debtor and Massey entered into an Employment and Confidentiality Agreement. Pursuant to that agreement, Massey was to receive a percentage of the sale price as a bonus. If the bonus became due while any amount on Massey's loan remained outstanding, the agreement provided, "the Company [Debtor] shall pay the Sale Bonus (or so much thereof as shall equal such then outstanding principal amount of the Note) to the Bank [CB & T] for and on behalf of Executive [Massey].... Any payment to

the Bank of all or a portion of the Sale Bonus as herein authorized shall for, all purposes hereof be deemed, a payment to Executive hereunder." (Joint Stip., ex. 22, Employment and Confidentiality Agreement ¶ 3(d).)

A sale of the subsidiary was completed, and Massey became entitled to a bonus of approximately $221,000. Consequently, Debtor gave CB & T a check dated October 31, 2002, in the amount of $171,653.14 in satisfaction of the balance due on the Massey loan. The payment was treated as compensation to Massey for income tax purposes.

*O'Connell loan:* The loan to Colman O'Connell was renewed by promissory note dated April 3, 2000, in the principal amount of $147,350.75. The note was payable in full on March 30, 2005, with interest due quarterly. Sometime in 2002, at least 90 days prior to Debtor's bankruptcy filing, O'Connell left his employment with Debtor to work for a competitor. Nevertheless, Debtor agreed to temporarily continue to service O'Connell's interest payments. It is unclear whether CB & T was notified of O'Connell's resignation. On December 31, 2002, Debtor paid CB & T $2,200.13 in interest on the O'Connell loan. Although the interest payment was treated as compensation for tax purposes, it was not paid in exchange for any services rendered by O'Connell as he had ceased working for Debtor at least two months earlier.

*Galbraith and Chandler loans:* Galbraith and Chandler also stopped working for Debtor. Galbraith resigned, and Chandler died. Neither Galbraith nor Chandler's estate made any arrangements to pay the amounts due under their respective notes. Consequently, Debtor's guarantee came due. Rather than paying the amount due in full, Debtor executed two notes on June 20, 2000, to replace its guarantee obligations on the Galbraith and Chandler loans with primary obligations. The Galbraith replacement note was made in the principal amount of $410,650.76, payable in 58 monthly installments. The Chandler replacement note was made in the principal amount of $1,703,062.83, payable in 58 monthly installments. Both notes had a variable interest rate set at 0.5% above the lender's prime rate. In January of 2002, Debtor requested that CB & T suspend the monthly amortization of the Galbraith and Chandler loans for six months. CB & T granted this request. However, the suspension ended more than 90 days prior to Debtor's bankruptcy filing and did not affect the transfers in issue.

During the 90 days preceding the bankruptcy filing, Debtor made three payments of $46,016.45 each on the two new notes. Checks for the payments were dated November 1, 2002, November 29, 2002, and January 3, 2003.

*Additional Material Facts:* The liquidating agent in this case, Ronald L. Glass, stated by affidavit his opinion that, based on his review of the proofs of claim filed in this case and the estate assets available for distribution to unsecured creditors, that there is no reasonable prospect for a 100% distribution to unsecured creditors.

The Court held a hearing to consider oral arguments on the cross motions for summary judgment on February 14, 2006. For the reasons explained in this Opinion, the Court concludes that, of the challenged transfers, only the interest payment on the O'Connell note may be avoided as a preference on summary judgment. The transfer made to satisfy the Massey loan remains an open issue, and the transfers related to the Chandler and Galbraith loans may not be avoided.

### Conclusions of Law

Summary judgment is governed by Federal Rule of Civil Procedure 56, made ap-

plicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056. Under Rule 56, a party is entitled to summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir.2000). The Court views all evidence and reasonable factual inferences in the light most favorable to the nonmoving party. *Burton v. Tampa Housing Auth.*, 271 F.3d 1274, 1277 (11th Cir.2001). However, the Court neither weighs the evidence nor determines its credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

At issue in this case is whether certain transfers made by Debtor to CB & T may be avoided as preferences. Section 547(b)[1] provides as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Even if all the elements of a preference are proven, the transfer may fall within one of the safe harbors set forth in § 547(c), including the following:

> (c) The trustee may not avoid under this section a transfer—
>
> (1) to the extent that such transfer was—
>
> (A) intended by the debtor and the creditor or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange;
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business for financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(1), (2).

▮▮▮ *Massey Loan:* The first transfer at issue was a check issued by Debtor to CB & T to pay the full principal due under

---

1. The applicable law in this case is the law as it existed prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

the Massey note. Before considering the five elements of a preference claim and any defenses, the Court will address the threshold issue of whether Debtor had a property interest in the funds transferred. CB & T has argued that the transferred funds were Massey's property because they constituted bonus money that he had earned. Debtor responded that because the money was paid from Debtor's general operating account over which Debtor had control, the money was property of Debtor. The Court agrees with Debtor on this issue. CB & T has not alleged that Debtor held the money in trust for Massey. The Supreme Court has stated that " 'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been property of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). In this case, the funds would have been property of the estate had they not been transferred. Just like any other creditor, Massey would have had a claim for the amount owed to him under the employment and confidentiality agreement. But, that claim does not deprive Debtor of an interest in the funds sitting in its operating account. Thus, Debtor transferred funds in which it had an interest.

■ The first element of a preference is whether the transfer was to or for the benefit of a creditor. In this case, the transfer was made to CB & T, but the creditor was Massey. Debtor had a contractual obligation to Massey to pay a bonus as a result of the sale of a subsidiary. Debtor transferred the money to CB & T for Massey's benefit—to pay off the balance of his loan. Thus, the transfer was made for the benefit of a creditor. It is important to note that this transfer was a three-party transaction. According to the written agreement between Debtor and Massey, the transfer was made to satisfy Debtor's compensation obligations to Massey; it was not made to satisfy any obligations Debtor may have had to CB & T under the guarantee. In fact, because Massey, in effect, paid the full amount due on his loan with the bonus he earned, Debtor never became liable to CB & T on its guarantee of Massey's loan.

■ The second element is whether the transfer was made on account of antecedent debt. The Court does not have the facts necessary to make this determination. The transfer was made on October 31, 2002. However, it is unclear when the debt owed to Massey arose. He became entitled to the sale bonus upon the sale of the subsidiary. Although the Court has combed all the documents provided by the parties in this case, it has found no indication of the date on which the sale was consummated, other than sometime in 2002. The Court must conclude, therefore, that Plaintiff has failed to offer any evidence to show that the transfer was made on account of antecedent debt.

With respect to the third and fourth elements—insolvency of the debtor and the preference period—the debtor is presumed insolvent during the 90 days prior to bankruptcy. 11 U.S.C. § 547(f). The transfer took place on October 31, 2002, which was both within the 90–day preference period and during the time which Debtor was presumed insolvent. With respect to the fifth element, Debtor submitted an affidavit from the liquidating agent stating his opinion that there is no prospect for full payment of unsecured creditors. As a result, the transfer enabled the beneficiary to receive more than he would have in a liquidation had the transfer not taken place.

Although Debtor has proven four of the five elements necessary to establish a preference, the lack of evidence regarding whether the debt was antecedent prevents a finding that the transfer either was or was not preferential. It also prevents the Court from considering any "contemporaneous exchange" defense raised by CB & T. Consequently, the Court will deny summary judgment to both parties with respect to the Massey transfer.

*O'Connell Loan:* The second transfer at issue was a payment by Debtor of the interest accrued on the O'Connell loan. CB & T has argued that, like the Massey loan, the payment on O'Connell's loan was made with O'Connell's money. As with the Massey loan, this argument fails. The funds were in Debtor's operating account over which Debtor had control, and there is no evidence that they were subject to a trust in favor of O'Connell. Although neither party provided a specific date that O'Connell ceased working for Debtor, CB & T conceded that he quit and his note became due in full more than 90 days prior to the bankruptcy filing and more than 60 days prior to the transfer.

■ The first question is whether the transfer was made to or for the benefit of a creditor. With this transfer, the creditor in question also was the recipient of the transfer. O'Connell had ceased working for Debtor and had no claim to payment of compensation from Debtor at the time of the transfer. However, upon the termination of his employment, his loan became due in full. He failed to pay, thus invoking Debtor's guarantee liability. Debtor's tender of only the accrued interest was apparently accepted by CB & T without any demand for full payment, even though full payment was due. Thus, the payment made on that loan was a transfer to a creditor for that creditor's benefit.

■ The second question is whether the transfer was made on account of antecedent debt. The payment at issue was made on December 31, 2002. CB & T acknowledged that O'Connell's resignation was effective at least 60 days prior to the bankruptcy filing and his note became due in full at that time. Because O'Connell failed to pay his note when due, Debtor became liable on its guarantee at least two months prior to the transfer. Thus, the transfer was made on account of antecedent debt.

With respect to the third and fourth elements—insolvency of the debtor and the preference period—the debtor is presumed insolvent during the 90 days prior to bankruptcy. The transfer took place on December 31, 2002, which was both within the 90–day preference period and the time during which Debtor was presumed insolvent. With respect to the fifth element, the affidavit of the liquidating agent establishes that the transfers at issue enabled the recipients to receive more than they would have in a liquidation had the transfers not taken place.

CB & T did not raise any defenses specific to this loan. Although it argued that all the transfers at issue were made within the ordinary course of business, it provided no evidence supporting that defense with respect to the O'Connell transfer. Because Debtor has established all the elements of a preference, the Court will grant summary judgment to Debtor on the O'Connell transfer.

■ *Galbraith and Chandler Loans:* The final three transfers at issue were payments made on notes executed by Debtor to replace its guarantee on the Galbraith and Chandler loans with primary liability. When Galbraith resigned from Debtor and Chandler died, they failed to satisfy their obligations to CB & T. Consequently, Debtor's guarantees came due. Debtor satisfied its guarantees by execut-

ing two notes in favor of CB & T on which it was primarily liable. It then made regularly monthly payments on the loans. The last three payments have been challenged as preferential.

The first question is whether the transfers were made to or for the benefit of a creditor. In this case, the loan agreements were made between CB & T and Debtor. Thus, CB & T was a creditor of Debtor. Debtor made the payments to CB & T. Therefore, the first element is satisfied.

The second element is whether the transfer was made on account of antecedent debt. The two notes were executed on June 20, 2000, and the payments were made on November 1, 2002, November 29, 2002, and January 3, 2003. Thus, the transfers were made on account of antecedent debt.

With respect to the third a fourth elements—insolvency of the debtor and the preference period—the debtor is deemed insolvent during the 90 days prior to bankruptcy. The transfers took place within the preference period and the time during which Debtor was deemed insolvent. With respect to the fifth element, the uncontested affidavit of the liquidating agent establishes that CB & T received more than it would have in a liquidation had the transfers not taken place.

While Debtor has proven all the elements of a preference, CB & T contends that the payments were made in the ordinary course of business. The arguments of both parties with respect to this defense miss the mark. Both focus primarily on the employee benefit plan. However, the transfers at issue was not made pursuant to the Plan. They were made pursuant to two installment notes that are in no way related to the Plan, so any discussion of the Plan in this context is irrelevant.

■■■ To prove the ordinary course of business defense, CB & T first must show that the transfer was made "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(A). Debtor contends that it is not the usual course of dealings for Debtor to satisfy a guarantee by incurring a new loan. However, that is not what CB & T must prove. "[C]ourts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace[.]" *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr.W.D.Va.1995). Furthermore, this prong can be established even if only one transaction of the type occurred between the parties because " 'this showing is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors[.]' " *Id.* at 735 (quoting *Campbell v. Cannington (In re Economy Milling Co. Inc.)*, 37 B.R. 914, 922 (D.S.C.1983)). The transaction in this case was an ordinary commercial transaction. Debtor needed funds to satisfy an obligation to CB & T, and it borrowed those funds from CB & T. There is nothing extraordinary about a business seeking a loan from a bank or to refinance an existing obligation. "An entity encountering difficult financial times often seeks loans from reputable institutions as part of its workout efforts." *Harman v. First Amer. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 488 (4th Cir. 1992). Thus, the underlying debt was incurred in the ordinary course of business.

■■■ The second question is whether the transfers at issue were made in the ordinary course of business of Debtor and CB & T. Courts have generally considered four factors to answer this question: "(1)

length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) the circumstances under which the payment was made." 5 Collier on Bankruptcy ¶ 547.04[2][a][ii][B] (15th ed. rev'd 2006). CB & T made the two loans to Debtor in June 2000. The transfers at issue were made approximately a year and a half later. Debtor had been making regular payments since the date of the loan. The disputed transfers did not differ in any significant way from prior transfers—either in the manner of payment or collection. As one court remarked, "The existence of two years of regular payments on the debt indicate that the last transfers, made in the same manner, are simply following the ordinary course of business pattern between the two parties." *Jeffrey Bigelow Design Group*, 956 F.2d at 488. *See also Kelley v. Chevy Chase Bank (In re Smith)*, 238 B.R. 879, 880 (Bankr. M.D.Ga.1999) (Walker, J.) (timely payments made according to the terms of an installment contract demonstrate "normal financial relations between a debtor and creditor....").

■ The final question is whether the transfers were made according to ordinary business terms. This question requires the creditor to "show that the disputed transaction was made both in the course of regular dealings between the parties and in accordance with the standards of the relevant industry." *Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac Leaseco, Inc.)*, 389 F.3d 1205, 1210 (11th Cir.2004). The Court has already discussed whether the transfers were made in the course of regular dealings between the parties. Debtor had been making regular payments to CB & T on the two loans for more than a year. Because there was nothing about the three disputed transactions that differed materially from the prior payments, the disputed transactions were made within the regular course of dealings of the parties. That leaves only the question of industry standards. CB & T showed that the loans were standard installment notes with the terms spelled out on a universal form used throughout the banking industry. The Court accepts this as evidence of the industry standard for installment notes. Debtor has offered no evidence to contradict it.

The Court finds that CB & T has shown that the three payments at issue were made in the ordinary course of business and, thus, cannot be avoided. Therefore, the Court will grant summary judgment to CB & T with respect to those transactions.

### Conclusion

The Court will grant summary judgment to Debtor with respect to the O'Connell transfer. The Court will grant summary judgment to CB & T with respect to the transfers relating to the Galbraith and Chandler replacement notes. The Court will deny summary judgment to both parties with respect to the Massey transfer.

An Order in accordance with this Opinion will be entered on this date. Dated this 6th day of June, 2006.